UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No: 2:24-cr-41-JAW |
| | ) | |
| GABRIEL SANCHEZ | ) | |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE
IN OPPOSITION TO SUPPRESSION**

Defendant Gabriel Sanchez, by and through counsel, hereby submits this Reply to the Government's Response in Opposition to Defendant's Motion to Suppress and for a *Franks* Hearing ("Opposition") (ECF No. 52).

**I.       THE GOVERNMENT'S OPPOSITION RELIES ON FACTS NOT KNOWN TO ANY OFFICERS.**

The reasonableness of a seizure depends on what the officers *knew at time of the seizure*. *See United States v. Jones*, 700 F.3d 615, 621 (1st Cir. 2012) (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968) ("In determining whether an officer had reasonable suspicion, we look to the facts 'available to the officer at the moment of the seizure or the search.'"); *United States v. Boyd*, No. 2:19-CR-00175-NT, 2021 WL 5304176, at *3 (D. Me. Nov. 15, 2021). Only information known to the acting officers can be considered to assess suspicion.

The Government's Opposition begins with a recounting of the 911 call that ultimately led to the seizure of Mr. Sanchez and the search of the tent. Opp. at 1-2. However, none of officers heard the 911 call, nor was a transcript of the call available to them at any time prior to Mr. Sanchez's arrest. Therefore, statements made to the dispatch employee *but not conveyed* to the acting officers cannot supply a basis for suspicion or probable cause in this case. Facts unknown to the officers are irrelevant to the Fourth Amendment analysis, and thus, Mr. Sanchez's Motion

1

properly excludes Olsen's statements to the dispatch employee during the 911 call.

Mr. Sanchez's Motion properly focuses on what was conveyed by the dispatch employee to the officers and Olsen's statements to Officer Martins. Dispatch conveyed that no threats were made during the caller's encounter with the male. Olsen told Martins that the object he claimed was a handgun was never pointed at him or removed from the male's waistband and he was not placed in fear. After conferring with Olsen, Martins broadcasted to the other officers:

> He's confirming a Hispanic male back there somewhere with a handgun in his waistband, didn't present it but he's a little concerned.[1]

Later, Martins broadcasted:

> Our caller is unwilling to prosecute if found.[2]

This is the sum of the information within the officers' knowledge about Olsen's encounter with the male.

The 911 caller's statements to the dispatch employee cannot be imputed to the acting officers. While the First Circuit recognizes that knowledge of each investigating officer can be imputed to others involved in an investigatory stop, *United States v. Meade*, 110 F.3d 190, 193–94 (1st Cir. 1997) (discussing the "fellow-officer/collective knowledge rule), there is no authority from the Supreme Court or the First Circuit that *undisclosed* information known by an employee of a police department, in this case the dispatcher, can be imputed to the arresting officers to supply the constitutionally required reasonable suspicion to seize or probable cause to search and arrest. Notably in *Meade*, the First Circuit expressed skepticism about applying the "collective knowledge rule" to impute knowledge of an entire law enforcement agency to officers involved in executing a search:

> A sensible argument has been made that looking to the agency's knowledge as a whole is

---

[1] G.Ex. 2 @ 17:52:00-:09.
[2] *Id.* @ 17:55:52-17:56:00.

> unwise because it may "encourage the dissemination of arrest orders based upon nothing more than the hope that the unevaluated bits and pieces in the hands of several different officers may turn out to add up to probable cause." LaFave, *supra* § 3.5(b), at 260. In the same vein, the collective-knowledge corollary of the fellow officer rule would seem to require, or at least presuppose, the flow of information from the officers with knowledge of facts tending to establish probable cause to those lacking that knowledge (or, at least, to the directing or arresting officer). *See* LaFave, *supra* § 3.5(b), at 260–61 n.53, § 3.5(c), at 266 n.72 (citing cases).

*Id.* (footnotes omitted).

Because there is no legal basis to impute what the dispatch employee heard but did not relay to the acting officers, the 911 recording cannot, as a matter of law, factor into the reasonableness of the officer's conduct in question. Therefore, the Government's reliance throughout its Opposition on the 911 call was erroneous. It is no coincidence that Gagnon makes no mention of a threat in his Affidavit for a search warrant.[3]

## II. THE GOVERNMENT'S POSITION ON THE TIMING OF MR. SANCHEZ'S SEIZURE IS UNSUPPORTED BY THE FACTS AND THE LAW.

The onset of the encounter in the woods occurred at 17:57:17 (5:57:17 p.m.). The Government maintains that Mr. Sanchez was not seized until Barnies told Ms. Morin she could not leave. That was at 18:15:40, nineteen minutes from the onset of his encounter with the campers.[4] It is unclear on what legal basis the Government distinguishes Ms. Morin's attempt to leave from Ms. Murray's at the beginning of the encounter. The Government inexplicably dismisses the fact that as Gagnon arrived on scene, approximately one minute behind Barnies, and in plain view of Mr. Sanchez and Ms. Morin, he refused to allow Ms. Murray to leave. Opp. at 9. The Government contends Ms. Murray was not detained. *Id*. The Government's position defies legal precedent, weakening the rest of its analysis, including its contention that Mr. Sanchez was

---

[3] G.Ex.5.
[4] G.Ex.3 @ 18:15:40.

3

somehow unaware that Ms. Murray was detained right in front of him.

The Government also ignores the fact that at 18:11:25, four minutes before the Government claims the campers were seized, Gagnon announced that he was securing the scene to obtain a warrant and that the campers needed to stop packing and stay away from the tent.[5] At that point, the detention morphed from a *Terry* stop into a *de facto* arrest. *United States v. Zapata*, 18 F.3d 971, 975 (1st Cir. 1994). The campers had already been told they could be arrested and if they did not vacate the area. A third officer had arrived. Everyone's name was called into dispatch. There were no warrants for Mr. Sanchez or Ms. Morin, but the officers did not leave them alone. Then Gagnon commanded everyone to stay away from the tent that they were supposed to be moving. At this point, it was clear the encounter was not about a trespass, but about something more serious. A reasonable person would equate the level of restraint and coercion around the seizure with being under arrest.

Turning back to the Government's position on the timing of the seizure, the Government seems to insist that a seizure occurs only when a person is physically restrained or commanded not to leave. This contention ignores the law. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (factors indicating a seizure where the person did not attempt to leave). Submitting to a show of authority constitutes a seizure. *Brendlin v. California*, 551 U.S. 249, 262 (2007) (seizure of passenger in stopped vehicle); *Terry v. Ohio*, 392 U.S. 1, 10 n.16 (1968) (seizure "when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen). In *Brendlin*, the Supreme Court explained that "what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is

---

[5] G.Ex.3.

not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin*, 551 U.S. at 262.

In this case, no reasonable person sitting inside a tent in a remote wooded area would have felt free to ignore a uniformed police officer shouting outside the tent, "Knock! Knock! Auburn police!" This was a show of authority and a command to answer. *See United States v. Gori*, 230 F.3d 44, 49 (2d Cir. 2000) (officers seized the occupants of an apartment through show of authority and issuance of order to exit the apartment); *United States v. Gomez*, 633 F.2d 999, 1002, 1004 n.6 (2d Cir. 1980). Mr. Sanchez submitted to Barnies' show of authority when he stopped what he was doing in the privacy of his tent, exited and agreed to vacate the area as Barnies commanded. The seizure continued when Barnies stood in front of the tent to monitor compliance with his order. Gagnon's arrival, his refusal to allow Ms. Murray to leave the scene and his threat of arrest further crystalized the encounter as one in which compliance was required, not optional. The time was 17:59:00 (5:59 p.m.) At that point, no reasonable person in Mr. Sanchez's position would have felt free to ignore the police and go about his business. No reasonable person would have believed he could go back inside the tent, zip up the door, and refuse to cooperate with the command to vacate. Those liberties were intruded upon. Under the law, this was a seizure.

### III. THE GOVERNMENT CANNOT MEET ITS BURDEN OF PROVING THE SEIZURE WAS REASONABLE.

The Government analyzes reasonable suspicion at a point far beyond the initial seizure, thereby relying on tainted facts, which defeats the Government's position. And the Government does not contend that probable cause existed when Gagnon froze the scene, effectively seizing the tent. *See Segura v. United States*, 468 U.S. 796, 806 (1984). The Government glazes over this point in the encounter, which Mr. Sanchez contends was the point of his *de facto* arrest, also

5

requiring probable cause. Instead, the Government focuses on whether the affidavit established probable cause to obtain the warrant. But consideration of the warrant is only appropriate if Mr. Sanchez's seizure and the seizure of the tent prior to obtaining the warrant were lawful. The Government cannot demonstrate either.

For argument's sake, Mr. Sanchez will address statements in the Government's Opposition that seem to justify a seizure prior to when the Government concedes one occurred. The Government indicates that officers were investigating "threatening behavior when they arrived on the scene." Opp. at 25. The Government relies on the 911 call to establish that Olsen was threatened with a firearm, Opp. at 11, 12. As discussed above, relying on the 911 call is erroneous and fatal to the Government's analysis throughout its Opposition. Moreover, Maine's Criminal Threatening statute states:

> A person is guilty of criminal threatening if he intentionally or knowingly places another in fear of imminent bodily injury.

17-A M.R.S.A. § 290. The record is devoid of facts establishing that Olsen was in fear of imminent bodily injury.

The Government also ignores the lack of evidence that Olsen observed an actual firearm. Motion at 2-3. There was no indication that Olsen had experience handling guns or that he was qualified to distinguish a real gun from a fake gun. *See, e.g., United States v. Padilla, 651 F. Supp. 3d 1261, 1270 (D.N.M. 2023)* (insufficient evidence to support enhancement for brandishing a firearm). At best, therefore, the record can establish only that Olsen observed either a BB gun, a toy gun, a replica, or an actual firearm. Therefore, the Fourth Amendment analysis must start with the nonthreatening display of what looked like a real gun. These facts were insufficient to provide reasonable suspicion that a crime had been committed to justify Mr. Sanchez's detention—which occurred at the latest when Gagnon threatened arrest.

In *United States v. Watson*, 900 F.3d 892, 893 (7th Cir. 2018), then Circuit Judge Amy Coney Barrett examined a seizure triggered by a 911 call reporting "boys" were "playing with guns" in a nearby parking lot. Holding that the police lacked reasonable suspicion, Judge Barrett stated, "the caller's report in this case about the presence of guns did not create a reasonable suspicion of an ongoing crime, because carrying a firearm in public is permitted with a license in Indiana." *Id.* at 895. Judge Barrett continued:

> To be sure, the presence or use of guns is not always legal. The caller's reference to "boys" might have meant minors, who generally cannot legally possess firearms in Indiana…And "playing with guns" might mean using them illegally or dangerously, including by pointing a gun at another or engaging in "tumultuous conduct"…Finally, those seen with guns might not have had the required gun licenses.
>
> But "a mere possibility of unlawful use" of a gun is not sufficient to establish reasonable suspicion. *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1014–15 (7th Cir. 2016). It must instead be "sufficiently probable that the observed conduct suggests unlawful activity." *Miranda-Sotolongo*, 827 F.3d at 669. And the connection to unlawful activity is just too speculative here. "Boys" could be a generic term for men of any age, and "playing with guns" could mean displaying them, which is not criminal conduct. Lacking detail, the report of guns in public does not suggest likely criminal activity.

*Id.* at 895-96. *See also United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000) ("even as dangerous as firearms may be" mere possession cannot justify a stop); *United States v. Vazquez-Lopez*, 2024 U.S. Dist. LEXIS 81992, at *48 (D.V.I. May 6, 2024). While Judge Barrett's holding is not binding in this Circuit, it is nonetheless instructive because like in Indiana, openly carrying a handgun in public is permissible, as is carrying a concealed handgun with a license in Maine. *See* 25 MRSA § 2001-A.

The Government also seems to suggest that reasonable suspicion arose when Gagnon realized Mr. Sanchez's identity as a felon because he matched Olsen's description. There are two weaknesses in this position. First, Olsen refused to prosecute, calling into question the reliability of his statements, including his description of the other male. Second, Olsen did not mention

facial hair, or arm tattoos, or a gold chain, all significant aspects of Mr. Sanchez's appearance. It is not clear from these facts that Olsen encountered Mr. Sanchez, or that officer's reasonably suspected that Mr. Sanchez was the male they were looking for, especially when there were other campers in the woods behind the Circle K.[6] There is nothing distinctive about a white tank top, which is commonly worn by men.

Moreover, the record does not support the Government's contention that Gagnon immediately recognized Mr. Sanchez. Gagnon's body-worn camera suggests that he did not realize Mr. Sanchez's identity until he heard Mr. Sanchez give his name to Barnies.[7] This will need to be fleshed out at a hearing. Even if Gagnon recognized Mr. Sanchez immediately, he was clearly not in possession of a purported firearm, and there was no basis to seize him. The seizure in this case was unreasonable and suppression of evidence seen, heard and collected as a result of the illegal seizure is warranted.

### IV. PROBABLE CAUSE TO SEARCH THE TENT WAS LACKING.

To the extent the Court finds consideration of the warrant appropriate, Mr. Sanchez maintains that a *Franks* hearing is necessary. The Government's attempt to deny or justify blatant misrepresentations and material omissions is unconvincing, particularly the circumstances involving Brandon Edwards. When a police officer conditions the non-execution of an outstanding arrest warrant on a witness's willingness to incriminate another suspect, it inherently taints the reliability of the witness's testimony and, by extension, weakens the probable cause derived from that testimony. This kind of bargain places undue pressure on the witness, creating a significant risk of fabricated or exaggerated statements made out of fear of arrest rather than truthfulness. Probable cause must rest on credible, unbiased evidence, not on

---

[6] G.Ex. 3 @ 18:06:15 (Barnies discusses two tents down path).
[7] G.Ex. 4 @ 18:03:33-18:04:19.

testimony obtained through coercive or self-serving deals that compromise the integrity of the judicial process. The inherent coercion in such a bargain distorts the witness's motivations, rendering any resulting accusations unreliable and insufficient to support a finding of probable cause.

Discounting Brandon's statements, there was no probable cause to search the tent for a handgun, and therefore, no basis to freeze the scene. Mr. Sanchez's and Ms. Morin's later admissions about a gun in the tent were fruits of the unlawful seizure and cannot furnish probable cause. Likewise, Ms. Morin's admission that drugs were in tent came after Gagnon announced he was freezing the scene and cannot factor into the probable cause analysis. Paraphernalia in a wooded area where unhoused individuals sleep does not supply the necessary probable cause to search the tent for drugs.

**CONCLUSION**

The Government's Opposition fails to meaningfully challenge Mr. Sanchez's Motion. Asserted facts and assumptions are unsupported by the *proper* record. Legal analysis is flawed. Because Mr. Sanchez's Motion properly frames the legal analysis and accurately applies the relevant facts to the applicable law, suppression is warranted.

To the extent the Court finds consideration of the warrant appropriate, Mr. Sanchez has established the need for a *Franks* hearing.

Dated:  August 14, 2024                                 Respectfully submitted,

/s/Heather Gonzales, Esq.
Attorney for Defendant
Assistant Federal Public Defender
P.O. Box 595
Portland, Me 04112-0595
207-553-7070
FAX: 553-7017
Heather_gonzales@fd.org

## CERTIFICATE OF SERVICE

      I hereby certify that I have this day electronically filed the foregoing Reply with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties of record.

Dated:  August 14, 2024                                                 /s/Heather Gonzales, Esq.
                                                                                      Attorney for Defendant